Bill. We're already in time to receive 15 minutes to revise Ms. Thomas for the appellant. Good morning. Good morning, Your Honors. Michele Thomas on behalf of the appellant, George And in the 10 minutes I have remaining, I would like to rest on my brief with respect to the due process, equal protection, and state law claims, which I feel that we've demonstrated are fairly defective as a matter of law. Unless any of the panel have any questions on those areas, then I would focus on the First Amendment retaliation claims. And with respect to those claims, they are equally defective as a matter of law. We're here on interlocutory appeal, having been denied summary judgment, but I believe that the record, even one viewed in a light most favorable to the plaintiff, clearly demonstrates that they cannot satisfy and have not satisfied the elements of a First Amendment retaliation claim. Primarily, they cannot establish that Ms. Arnone was engaged in protected speech. Because at the hub, this is a situation where Ms. Arnone admittedly directed threatening language at a police officer in a private context. We don't have public speech. We don't have a public employee. We don't have an arrest. We have an individual who thought it was appropriate to threaten a police officer after receiving a minor traffic violation. Counsel, the language that's quoted here that she used in her anger toward the police officer, where does that language, where is that recorded? Do you know what I mean? The actual threats? I mean, is... In this case, there's... Very violent sort of... Yes. I'm married to a sailor, and I haven't heard that type of language very often. That was issued... The most vile version of it comes from Ms. Arnone herself in her deposition. Oh, really? Yes, and I know it's cited in our brief. I can pull it out. I have it highlighted. Well, it's quoted exactly as to what she said. Exactly. That is word for word what Ms. Arnone said in her deposition. I see. That's where it comes from. That's the only place it comes from. I'm going to... She did that in her deposition. That's what she said to the officer. Correct. As he walked away from the car. But frankly, that's... It's slightly a red herring. I mean, I understand the cases, and I understand Plaintiff's position that police officers are supposed to be immune from that type of obscenity. But that's not where this case left. That's not the only thing Ms. Arnone said. What she said that caused the officer to continue his investigation is she said, you better never come across my table. And this is from an individual who was in scrubs, hospital scrubs, and who had disclosed that she was late for work at a nearby hospital where a patient was waiting for her. So his concern was that knowing that officers and other law enforcers like Chris Mill got treated at the hospital, he was concerned that this might affect his colleagues adversely. Correct, Your Honor. And herself. May I ask, counsel, where does that... I didn't... I guess, did I miss that? That this was something other than his anger at her, you know, her ugly outburst? Was some fear about people in... Yeah, I guess it was said that he would fear that any police officer would get treated the same way, even though it was not they that stopped her or ticketed her or made her late for work. The general... The idea... Is that... That was said? Yes, it was said by both Officer Luzelt, the police officer. Yager, right, okay. It also appears in the deposition testimony of... Is that what he said when he went to the hospital to report her? Yes, that is... And all the officers are at risk now. Correct. The HR representative at the hospital, Anita Yager, has in her notes and summaries, it's been... She documented in writing that the officer's concern was he would be taken to Cottage Hospital if he was injured in the line of duty, and that is confirmed in the record. Right, but not his... She wasn't... Was he also complaining about fellow officers? Yes, because, again, it's undisputed that in this very small community, if an officer, a Grosse Pointe Farms officer is injured, they are taken to Cottage Hospital. So, did he... I mean, what's the implication that he was... By him, that she was exhibiting some kind of law enforcement animus? Well, he said, quite honestly, and Ms. Arnone admitted, she was very irate. This was her second ticket in three days, and she was late for work. It was already after 7.30. She was supposed to be there at 7.45. She also disagreed with the basis of the ticket, and she went on and on at that. But, I mean, the point here is, it was... And Ms. Jaeger testified under oath, and it's in her notes and in her summaries, that it wasn't just what Ms. Arnone said. It was the tone in which she said it, and the fact that any reasonable person would feel that it was plausible for her to carry out this threat should Officer Roosevelt or his colleagues present themselves at the hospital. Okay, what is... I want you to focus now on why does this court have jurisdiction, or why is this interlocutory appeal appropriate for a decision by this court at this time? Because we're here on matters of law. We are not disputing the facts. We will accept diversion that's in the record. I mean, frankly, the spin that's been given by the plaintiff is not supported by the record. One of the federal and state claims in this case, correct? Correct. And so, which claims specifically are appropriate for this court to decide on an interlocutory appeal? All of them, because we are asserting qualified immunity, and that's a matter of law. And, again, the case law is well-established most recently by this panel, I believe, in the Sotomayor case, that as long as the question is one of law and application of qualified immunity to a record presents questions of law, application of the issue of clearly established presents questions of law, and whether there is protected speech presents questions of law, and that's what we're arguing. What happens if, in determining those issues, that the questions of fact and the questions of law are inexplicably intertwined? Then, again, the case law makes it clear that this court must look at the record and view it because it was summary judgment, and the light must have rolled a plan. And, again, our position is, do that very thing. They still don't satisfy the elements that are required to establish a First Amendment retaliation claim because there is not protected speech. Even if you accept the spin that Ms. Arnone put on this after the fact, even if you discount the fact that she admitted to her... We do have to credit her version at this stage of the proceedings, do we not? Yes, you do. Right. And her version, by the way, is... Best case scenario, her version is, I said, I hope I never see you again and I never see your friends again at my place of employment. Okay, so that's giving her the best spin on what she said. She also admitted that she told the officer, you better never come across my table. She admitted that to her employer. She admitted it repeatedly to the HR employment people. But even if you say, okay, even if we say, we can't really establish... It's disputed whether she said, you better not come across my table. The fact is that she warned this officer not to come to her place of employment after he gave her a ticket, when she's dressed in scrubs and going to a hospital where he will receive treatment. So we get right back to unqualified immunity. Was it objectively reasonable? That idea that if and when he gets injured, whenever that might be, years hence, or the next day. The next day would be more. But the issue here is whether or not there was a true threat. So the attenuation between her angry outburst, ugly outburst, at being ticketed and being leered at, translates to a threat deserving of reporting to her employer. Isn't that what we're really concerned about here, whether it was a true threat? Yes. Yes. The initial question is, is this a true threat? I'm concerned a bit about the attenuation. Well, I would like to disagree in that regard, because the testimony, and it's uncontradicted, is that if he were injured on the job, he would go to the hospital. The injury could have occurred within a minute. It didn't have to be the next day or the next year. But I guess my point is that if you want to look at whether this is a true threat, then you don't look at Ms. Arnone's subjective intent or explanations. The test, as a mayor of law, is whether under these circumstances it was reasonable for Officer Roosevelt to feel threatened. So that's why I think, again, our position is this is a question of law, because you don't look at what she did. I agree, counsel, that we must take everything in. We have to give the very best spin for our work on this case at this stage of the game. We must credit the best spin that the arrestee puts on it in her deposition or the trustee on her behalf. Well, that's correct. Although, Judge Cook, I would like to point out she was not arrested. She was not arrested for threatening me. Right. I think that makes a big difference. This is not a retaliatory arrest. This was a police investigation, and I know my time is up. But just for my final point there, except all that's true, except there might be a question of fact as to whether or not there's a true threat, they still can't overcome the hurdle of whether or not this right was clearly established. There is no case on point here that was in existence when this occurred in 2010. All right. Thank you. The only case that is here is Fritz that was 212, and they can't establish proximate cause, and they can't establish clearly established. You've answered my question. Thank you. Thank you. Are there any other questions? You will have your time on rebuttal. Thank you. Counsel? Thank you, Your Honor. May it please the Court, Barry Fagan on behalf of the Plaintiff Appellee. A couple things here. First of all, the language that my client has testified to in her deposition is totally inconsistent with what Officer Loosevelt claims that she said at the traffic stop. And the language we quoted on page 8 of our brief. Now, it was not very nice language. It was nasty language, but it was certainly not threatening language, and it's totally different than what Loosevelt was claiming that she said. And for purposes of this appeal on qualified immunity, you have to accept the best version of the facts. So in determining whether it's threatening, do you base that on the mindset of the speaker or the effect on the hearer? It's what a reasonable person would believe is threatening, not just on the subject. A reasonable speaker or the reasonable hearer of the threat? I believe it's a reasonable hearer of the threat, but it's based upon reasonable belief. And her version of the facts, there's no comment about, I hope I never see you across my table. She has some nasty language, and it's protected free speech clearly under the First Amendment. And he had no business going to her place of employment and reporting that she had threatened him. He's got the right of free speech to speak for himself. What's that, Your Honor? I mean, the officer, when you say he had no right to go to her business, he is a citizen of the United States just like everybody else. Under the First Amendment, he doesn't have the right to go and express himself. He's working as a police officer, as a state actor in full uniform. And according to Anita Yeager, the human resource representative, she believes he's there on official police business. That was her testimony. And even though in deposition he testified, when I asked him about this, at the time when this altercation occurred, based upon what he claims that she said, he said, I did not know it was a threat. That was his testimony. It's in the brief. So he says to me in deposition, I did not know it was a threat. Yet, he goes off the grid, doesn't notify dispatch, doesn't notify his supervisor, and goes right over to Cottage Hospital. Is that a violation of some law? I think that's a violation of the First Amendment because you can't retaliate against somebody because they say nasty things to you. What's the word for retaliation? Retaliation is his response to her coming. Going to the hospital to say what? Yes. It's just like page versus pointer. Okay, but just going and reporting what happened, how can that be retaliation? It's retaliation because given what he said, the true intent, at least the motive was to obviously get her into trouble. And because he goes there and he says that she threatened me. Now, in deposition, he told me, I didn't know it was a threat. But he goes there and says that she threatened me. And then he expands it beyond what he originally claimed that she said. Initially, in his notes, he said that she said, I better not see you across my table. He tells Anita Yeager that she said, I better not see you or my family or your family across my table. So now he's expanded it to include his family. And then he says, my wife's a nurse, and I'm concerned about how this treatment is going to affect me and other police officers. So the motivation, which is a question of fact for the jury, our position is, was that he wanted to get her in trouble because he was not happy with her language. And so that's the retaliatory conduct. Just like in page versus pointer, where there was an individual from a municipality that reported to an individual's employer that she made some public comments that he did like, and subsequently she was terminated. So it's a very similar situation with regard to that. So her comments are protected free speech. And at the time, it's our position that retaliation for making comments that are protected by free speech is protected by the Constitution, and it was clearly indicated at that time. And as a result, that's a viable claim. And certainly with regard to qualified immunity, if you're assuming the best evidence for us with regard to that claim, then how would it be reversible at this point based upon the ruling of Judge Tarnow in the lower court? Any other questions with regard to that issue? I'm not sure what else I can say on this issue, but the concern is that based upon what Ms. Arnone had said in her deposition, as soon as those facts be true, what basis would Officer Loosevelt have had to go over to the hospital in that situation? According to his supervisor, Lieutenant Rosati, Officer Loosevelt was not an investigator. He didn't arrest her at the scene. If he felt that there was any reason to follow up on this, he should have reported it to the Detective Bureau, according to Lieutenant Rosati. He didn't do that. He just paraded over there and made this complaint claiming that she had threatened him, which the natural, perceivable consequence of that was that she was subsequently terminated, which we believe is a First Amendment claim. Thank you. Thank you. Rebuttals? Okay, just to clarify, the record is what the record is, and this court has been provided with it. I don't want to stand here quibbling about what he said, she said. The record was established. Yes, there was obscenity, but beyond that, there was a threat. So motivation on the part of Officer Loosevelt was to proceed to the hospital to conduct an investigation because he acknowledged that her threat as issued may or may not be a crime. That's why he didn't arrest her. Okay. You know, there were issues in there about the scope of employment and whether or not an investigation was within the scope of his employment. But setting that to the side for a moment, counsel opposite says that the proper procedure would have been for Officer Loosevelt to report this to the Detective Bureau and perhaps have a non-interested party conduct an investigation. What's wrong with that and why did that happen? Because it's not true. Okay, again, we're looking at the record, not just portions of some testimony from Lieutenant Rosetti's deposition. Lieutenant Rosetti is the head of the Detective Bureau. He was not Officer Loosevelt, Sergeant Loosevelt's supervisor, as a matter of record. As a matter of record, Sergeant Loosevelt was the road supervisor for that day. And according to Director Jensen, the chief of police, who was everybody's supervisor, including Lieutenant Rosetti, it was absolutely within Officer Loosevelt's authority as a patrol officer and as the road supervisor to conduct a follow-up investigation in order to determine whether, in fact, a crime had been committed. As both Director Jensen and Officer Loosevelt explained, had he found out that Ms. Arnone was a secretary, end of question. He just wanted to know, based on her comments and the fact that she's in scrubs, was she, in fact, in a position to harm him? Was it plausible? If it's plausible, then he goes to the Detective Bureau, and then they follow up from there. But the protocol was for him to first investigate the matter. And there is no contradiction in the record in that regard. Which, in fact, he did. And that's all he did, is that he went and asked, what is this woman's position here, because this happened today, and I'm worried. I'm worried about myself. I'm worried about my colleagues. And, by the way, I'm worried about my family, because I'm a resident of Grosse Pointe Farms, and we seek treatment here as a family. All legitimate concerns. And, again, even if we get, I guess my point is, there was no protective speech here, even assuming there is. They still have not established that the right of Ms. Arnone not to be investigated for whether you want to call it a blatant or subtle threat, was clearly established, doesn't exist. There is no case law at all. And as the Supreme Court has made very clear, we have to look at this in the particular context. Not just as any general First Amendment case. It's not. Again, we're not looking at retaliatory arrest. We're not looking at a public employee. We're looking at, like we are in Fritz, where there is an investigation by the police that prompts action by a private employer. And, by the way, in this case, the action by the private employer was separate and distinct from the investigation conducted by Sergeant Luzardo. If we conclude, going back to whether or not this investigation was properly within the scope of his employment, if we conclude that at the time of the investigation that he was acting outside of the scope of his employment, do you lose? No. Why not? Because he reasonably believed he was acting within the course of his employment. A belief that not only he, that under the circumstances, which is the test, was reasonable under these circumstances, but was corroborated by counsel. If we credit the testimony that we just heard, or the evidentiary matter that we just heard from counsel about that the officer wanted to protect his family, is that within the scope of his duties that day on the job? Certainly. He's a police officer, and there's a possible threat. A father and a husband. It sounds like that's the focus. Well, it wasn't the focus, first of all.  Now, Sergeant Luzardo's testimony and the record created at the time of the citation don't mention his family. That's only in the documentation produced by the hospital. That comes from his deposition? In his deposition. In his deposition, he indicated, yeah, I mean, he was worried. He was worried about himself. He was worried about his colleagues. Well, I'm trying to just see how we separate the efforts to go and worry about yourself and worry about your family on the job about a surly person you were about to ticket and you didn't arrest, but ticketed, stopped. Okay. Judge Hook, again, I think the point is Ms. Arnone was surly at the outset. That everybody agrees, including her. And then there were some obscenities. The question is whether that – the question I think I understand. The question is whether or not the First Amendment protects her from retaliation by a state actor for being a surly, obnoxious jerk to a police officer. Yes, it does. But that's not the issue. The issue is, does the First Amendment protect her when, in addition to being surly, she utters a threat? In her position, it does not. I think it was a threat. Pardon me? Am I right to understand counsel's argument that the officer testified that he did not view it as a threat? That's absolutely untrue. Okay. What the officer testified in his deposition is that he didn't know whether it was an arrestable offense for threatening an officer until he determined the plausibility of the threat in a real-life setting. In other words, had this woman – for him, the point was she's dressed in scrubs and she's late to treat a patient. We understood that argument. So you just told us that, and I appreciate that. Thank you. Thank you. Thank you. The matter is submitted. We thank you for your argument.